**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert A. White,<br><br>         Plaintiff,<br><br>v.<br><br>Merrill Lynch Pierce Fenner & Smith Incorporated,<br><br>         Defendant. | No. CV-21-00941-PHX-JJT<br><br>**ORDER** |

At issue is Defendant Merrill Lynch Pierce Fenner & Smith Incorporated's ("Merrill Lynch") Motion to Dismiss (Doc. 13, Mot.), to which Plaintiff Robert A. White ("Mr. White") filed a Response (Doc. 16, Resp.) and Defendant filed a Reply (Doc. 18, Reply). The Court held an evidentiary hearing on issues related to the Motion to Dismiss on February 25, 2022 (Doc. 28). On March 4, 2022, Plaintiff filed Supplemental Briefing Re Evidentiary Hearing Held 25 February 2022 (Doc. 37), to which Defendant filed a Response (Doc. 37) and Plaintiff filed a Reply (Doc. 40). The Court also resolves the Supplemental Briefing in this Order. The Court finds this matter appropriate for decision without further oral argument. *See* LRCiv 7.2(f).

**I.    BACKGROUND**

Plaintiff is 90 years old and a resident of Scottsdale, Arizona. (Doc. 1, Complaint ("Compl.") ¶¶ 1, 2.) Defendant is a licensed retail brokerage securities dealer doing business in Arizona, with a principal place of business in Charlotte, North Carolina. (Compl. ¶ 5.)

Plaintiff holds a Self-Directed Trust Cash Management Account ("CMA") with Defendant. (Mot. at 1; *see also* Compl. Ex. 3.) This account is a margin account, meaning that Plaintiff is able to purchase securities using money borrowed from Defendant against the account, with such borrowing subject to interest. (Compl. ¶¶ 8, 9.) Defendant alleges, and Plaintiff disputes, that both the Client Relationship Agreement and Margin Agreement Mr. and Mrs. White signed upon opening the account included arbitration agreements, and both documents were provided to Plaintiff in their entirety. (Mot. at 3-4; Resp. at 4.)

Plaintiff alleges that on June 11, 2020, he sold assets in the account in order to fully pay off the then-existing margin liability, leaving an asset value of $397,973 and a cash value of $105,987.63. (Compl. ¶ 13.) The next day, Plaintiff purchased shares of IBM and Tesla for $906,939. (Compl. ¶ 14.) The cash value in the account was credited against the purchase price, leaving an outstanding purchase price of $800,948. (Compl. ¶¶ 2, 15.) Plaintiff argues that, pursuant to Regulation T, only the difference between the outstanding purchase price and the account asset value should have been charged as margin borrowing. (Compl. ¶¶ 2, 15.) Plaintiff asserts that Defendant disregarded the asset value of $397,973 and instead charged the entire $800,948 on margin. (Compl. ¶¶ 2, 15.) Plaintiff further contends that the asset value has vanished from his account and Defendant has refused to explain to Plaintiff what happened to it, despite Plaintiff's repeated requests for information. (Compl. ¶¶ 2, 15.)

On May 5, 2021, Plaintiff filed a Complaint in this Court invoking both diversity and federal question jurisdiction and seeking actual and punitive damages. Plaintiff alleges that Defendant breached the terms of the margin account contract (Compl. ¶¶ 19-26), and also that Defendant committed fraud in connection with the purchase and sale of securities (Compl. ¶¶ 27-35), conversion (Compl. ¶¶ 37-42), fraudulent concealment (Compl. ¶¶ 43-47), and negligent misrepresentation (Compl. ¶¶ 48-54), resulting in Plaintiff's loss of at least $397,973. Defendant now moves to dismiss this suit under Rule 12(b)(1), contending that Plaintiff has failed to allege facts sufficient to establish Article III standing. (Mot. at 5-6.) In the alternative, Defendant argues that the Court should order joinder of the White

Living Trust pursuant to Rules 12(b)(7) and 19, compel arbitration pursuant to Rule 12(b)(1), and either dismiss or stay the case pending the completion of arbitration. (Mot. at 6.)

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(1)

"A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may attack either the allegations of the complaint as insufficient to confer upon the court subject matter jurisdiction, or the existence of subject matter jurisdiction in fact." *Renteria v. United States*, 452 F. Supp. 2d 910, 919 (D. Ariz. 2006) (citing *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)). "Where the jurisdictional issue is separable from the merits of the case, the [court] may consider the evidence presented with respect to the jurisdictional issue and rule on that issue, resolving factual disputes if necessary." *Thornhill*, 594 F.2d at 733; *see also Autery v. United States*, 424 F.3d 944, 956 (9th Cir. 2005) ("With a 12(b)(1) motion, a court may weigh the evidence to determine whether it has jurisdiction."). The burden of proof is on the party asserting jurisdiction to show that the court has subject matter jurisdiction. *See Indus. Tectonics, Inc. v. Aero Alloy*, 912 F.2d 1090, 1092 (9th Cir. 1990).

### B. Standing

Article III Courts are limited to deciding "cases" and "controversies." U.S. Const. art. III, § 2. "Two components of the Article III case or controversy requirement are standing and ripeness." *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009). To have standing under Article III, a plaintiff must show: (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) the injury is fairly traceable to the challenged action of the defendant; (3) it is likely, not merely speculative, that the injury will be redressed by decision in the plaintiff's favor. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). A complaint that fails to allege facts sufficient to establish standing requires dismissal for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Id.*

### C. Federal Rule of Civil Procedure 12(b)(7)

Under Rule 12(b)(7), a party may move to dismiss an action for failure to join a necessary and indispensable party under Rule 19. Courts apply a three-step process when evaluating a Rule 12(b)(7) motion. *See E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1078 (9th Cir. 2010). First, the court identifies whether a nonparty is required to join. A nonparty is necessary if (A) the court cannot accord complete relief in the nonparty's absence, or (B) the nonparty claims an interest in the action such that its absence may (i) impair or impede its ability to protect that interest or (ii) expose an existing party to the risk of incurring multiple or inconsistent obligations. *See* Fed. R. Civ. P. 19(a)(1). This analysis heavily depends on the facts and circumstances of the case. *Peabody W. Coal Co.*, 610 F.3d at 1081. If the court concludes a party is necessary under Rule 19(a), it must then determine whether joinder is feasible. *Id.* at 1078. Finally, if the absent party cannot be joined, the court must determine whether, "in equity and good conscience," the action may proceed in its absence or should be dismissed. *Id.*; *see* Fed. R. Civ. P. 19(b).

### D. Arbitration

The Arbitration Policy at issue is governed by the Federal Arbitration Act ("FAA"). The Supreme Court has recognized the FAA as a "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). "[C]ourts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted).

To resolve a motion to compel arbitration under the FAA, 9 U.S.C. § 1 *et seq.*, a district court must determine (1) whether the parties entered into a valid agreement to arbitrate, and (2) whether the arbitration agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). If both elements are met, the FAA requires the court to enforce the arbitration agreement. *Id.* "A motion to compel arbitration is decided according to the standard used by district courts in

1  resolving summary judgment motions pursuant to Rule 56, Fed. R. Civ. P." *Coup v.*
2  *Scottsdale Plaza Resort, LLC*, 823 F. Supp. 2d 931, 939 (D. Ariz. 2011). That is, "[i]f there
3  is doubt as to whether such an agreement exists, the matter, upon a proper and timely
4  demand, should be submitted to a jury. Only where there is no genuine issue of fact
5  concerning the formation of the agreement should the court decide as a matter of law that
6  the parties did or did not enter into such an agreement." *Three Valleys Mun. Water Dist. v.*
7  *E.F. Hutton & Co., Inc.*, 925 F.2d, 1136, 1141 (9th Cir. 1991).

**III.    ANALYSIS**

Defendant moves to dismiss under Rule 12(b)(1) and, in the alternative, moves to compel arbitration. A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "is a procedurally sufficient mechanism to enforce [an] [a]rbitration [p]rovision." *Cancer Center Assocs. for Research and Excellence, Inc. v. Philadelphia Ins. Cos.*, 2015 WL 1766938, at *3 (E.D. Cal. April 17, 2015) (citing *Filimex, L.L.C. v. Novoa Invs., L.L.C.*, 2006 WL 2091661, at *2 (D. Ariz. July 17, 2006)). On a motion to dismiss for lack of subject matter jurisdiction, a district court may consider matters outside the pleadings without converting the motion into one for summary judgment under Federal Rule of Civil Procedure 56. *See, e.g.*, *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988), *cert. denied*, 489 U.S. 1052 (1989). A court may also consider matters outside the pleadings when deciding a motion to compel arbitration. *See* 9 U.S.C. § 4; *Shields v. Frontier Tech.*, LLC, No. CV 11-1159-PHX-SRB, 2011 WL 13070409, at *4 (D. Ariz. Nov. 30, 2011). For the reasons outlined below, the Court finds that it lacks subject matter jurisdiction, and Plaintiff's claims are subject to arbitration.

Defendant argues that Plaintiff has not suffered an injury in fact as required to establish Article III standing, because the owner of the account at issue is the White Living Trust, not Plaintiff in his individual capacity. (Mot. at 5-6.) In support of its argument, Defendant cites several exhibits that indicate the White Living Trust is the account owner. (Mot. at 5-6.) For example, Defendant asserts that Plaintiff signed a Trustee Certification Form for the Trust CMA Account, and the signatures were notarized. (Mot. Ex. 3 at 3.)

- 5 -

1  Defendant further argues that this matter should be determined by arbitration before the
2  Financial Industry Regulatory Authority ("FINRA"), due to arbitration provisions
3  incorporated in both the CMA Application and the Margin Account Application and
4  Agreement ("Margin Application"). (Mot. at 2-3; Mot. Ex. A ¶¶ 3–4, 6-7; Mot. Ex. 1 at 2,
5  8, 17-18; Mot. Ex. 2 at 2, 8; Mot. Ex. 4 at 3, 6-7; Mot. Ex. 5 at 3.)

6  Plaintiff maintains that he executed the account documents in his individual
7  capacity, not as a trustee, so it follows that he is indeed the proper plaintiff. (Resp. at 3.)
8  Plaintiff explains that in 1990, he opened a stock account with the non-party Scottrade.
9  (Resp. at 1.) He asserts that Scottrade handled the transfer of his account to Merrill Lynch.
10 (Resp. at 1.) He also notes that the Margin Account Application states that the "Primary
11 Account Holder" is "Robert A. White," not "Robert A. White, Trustee." (Resp. at 3; Resp.
12 Ex. 1 at 3.) Finally, Plaintiff claims that the Trustee Certification Form contains errors, was
13 not completed in his handwriting, and the initials on the second page of the document are
14 forgeries. (Resp. at 2; Mot. Ex. 3 at 2.) He also alleges that the signatures appearing on a
15 document used to transfer assets into Plaintiff's account with Merrill Lynch are forged.
16 (Doc. 19, Notice of Filing Declaration in Support of Request for Hearing at 1.) Finally,
17 Plaintiff argues that his claims are not subject to arbitration, because he never received a
18 document with an arbitration clause. (Resp. at 4.)

19 First, the Court finds that the authenticity of the allegedly forged initials and
20 signature are immaterial. These alleged forgeries have no bearing on whether Plaintiff
21 opened the account in his capacity as a trustee or consented to arbitration. Even if the
22 forgeries were material, the Court found credible the testimony of Michael Penney
23 ("Mr. Penney"), the Financial Solutions Advisor who worked with Mr. and Mrs. White in
24 opening the Merrill Lynch Account. (Doc. 38, Tr. 86:8, 87:1-6.) Mr. Penney testified that
25 he filled out the Trustee Certification Form in the presence of Mr. and Mrs. White in his
26 own handwriting. (Tr. 90:1-15, 92:8-93:9; Hr'g Ex. 7.) He further testified that he has never
27 altered a document after it has been signed by a client, and he most likely witnessed Mr. and
28 Mrs. White sign and initial the document. (Tr. 91:12-22; 93:10-19; Hr'g Ex. 7.)

Second, the Court finds that whether Plaintiff intended to sign the documents as an individual is irrelevant. During the February 25, 2021 Evidentiary Hearing, Defendant introduced account statements from Scottrade, which became Ameritrade in 2018. (Tr. 37:1-14.) The account statements show that the account was linked to "ROBERT A WHITE AND HARRIET H WHITE TRUSTEES FBO WHITE LIVING." (Hearing Ex. 8.) Further, Defendant introduced a Deed of Trust from December 2, 2002. (Tr. 39:19-23.) The document names "Robert A. White, Individually and as Trustee and Harriet N. White, Individually and as Trustee of the WHITE LIVING TRUST . . ." (Hr'g Ex. 24.) Plaintiff acknowledged that he recognized his signature and Mrs. White's signature on the document. (Tr. 39:23-49:8.) Defendant also introduced a warranty deed dating to August 2020, conveying property to "Robert A. White and Harriet N. White, Trustees of THE WHITE LIVING TRUST U.A.D." (Hr'g. Ex. 32.) Plaintiff testified that the title company insisted he sign the form and explained that there is an identical copy with the word "trust" omitted. (Tr. 41:14-20.) However, Plaintiff did not dispute the authenticity of his signatures on the Deed of Trust and Warranty Deed introduced during the hearing, both of which indicate his status as Trustee. Plaintiff also does not dispute the authenticity of his signature on the Trustee Certification Form, the title of which clearly indicates the form's purpose. (*See generally* Resp., Doc. 19.)

While these facts suggest the trust is the appropriate plaintiff in this litigation, the Court also acknowledges that Plaintiff insists the trust does not exist. (*See, e.g.*, Tr. 18:5-16.) Accordingly, the Court will not make any determination regarding the status of the trust in the instant case.[1] Nonetheless, upon consideration of the parties' briefs and the evidence presented during the February 25 hearing, the Court finds that Plaintiff held himself out as a trustee, and it was reasonable for Defendant to rely on the previously referenced documentation, including account statements from Scottrade, and a clearly labeled "Trustee Certification Form" with signatures in reaching the conclusion that it was

---

[1] The Court takes judicial notice of Mr. White's litigation regarding the existence of the trust, currently pending in Maricopa County Superior Court, and acknowledges that the determination is outside the scope of the present matter. *See Robert A. White v. Empire West Title Agency Inc.*, No. CV2021-012556.

1 doing business with Mr. White as a trustee, and that as a trustee, Mr. White consented to
2 arbitration.
3       For these reasons, Defendant argues that the Court should compel the joinder of the
4 White Living Trust and compel arbitration. (Mot. at 6-16.) In the event that such a trust
5 does exist, joinder would be appropriate. However, because the existence of the White
6 Living Trust is currently being litigated in Maricopa County Superior Court, the question
7 before the Court is whether Plaintiff himself is subject to arbitration. Because Plaintiff held
8 himself out as a trustee and agreed to arbitration provisions incorporated into the
9 agreements he executed, the Court finds that arbitration is appropriate.
10       To reiterate, the party seeking to compel arbitration must show (1) that a valid
11 agreement exists and (2) that the agreement encompasses the dispute at issue. *Lifescan,*
12 *Inc.*, 363 F.3d at 1012. Defendant has met this burden. In executing the CMA Application,
13 Plaintiff agreed that the Merrill Edge Self-Directed Investing Client Relationship
14 Agreement ("Client Relationship Agreement") was incorporated by reference. (Mot.
15 Exs. A ¶¶ 3–4; 1 at 2, 8; 2 at 2, 8.) The Client Relationship agreement provides:

> Agreement to arbitrate controversies
>
> This Agreement contains a predispute arbitration clause. By signing an arbitration agreement the parties agree as follows:
>
> - All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.
>
> - Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.
>
> \* \* \*
>
> You agree that all controversies that may arise between us shall be determined by arbitration. Such controversies include, but are not limited to, those involving any transaction in any of your accounts with Merrill Lynch, or the construction, performance or breach of any agreement between us, whether entered into or occurring prior, on or subsequent to the date hereof.
>
> Any arbitration pursuant to this provision shall be conducted only before the Financial Industry Regulatory Authority Inc.

- 8 -

> ("FINRA") or an arbitration facility provided by any other exchange of which Merrill Lynch is a member…

(Hearing Ex. 12.) Mr. Penney testified that the Client Relationship Agreement is always provided with the application, and he would have provided it to Mr. White when he came in to the Merrill Lynch Office. (Tr. 89:1-10.) Mr. White would have been permitted to take the document home with him, and the agreements are also available on the Merrill Edge website. (Tr. 89:9-23.) Additionally, when Plaintiff executed the Margin Application, he agreed that he had received a copy of the Margin Agreement, which contains an arbitration clause that is identical to that found in the Client Relationship Agreement. (Mot. Exs. A ¶¶ 6–7; 4 at 6-7.)

Plaintiff disputes the validity of the arbitration clause and contends that there was no "clear and unequivocal" incorporation by reference of the aforementioned arbitration clauses because "it would not be clear to a reasonable person which documents were being referenced, especially when the documents were never explained, provided, or reviewed." (Resp. at 5.) This is an issue of contract formation, so the Court applies Arizona state law. *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014) ("When determining whether a valid contract to arbitrate exists, we apply ordinary state law principles that govern contract formation."). "Under Arizona law, a contracting party agrees to terms and conditions in an extrinsic document if the agreement being executed clearly and unequivocally refers to the extrinsic document, the party consents to the incorporation by reference, and the terms of the incorporated document are 'known or easily available to the contracting parties.'" *Edwards v. Nutrition*, 2018 WL 637382, at *3 (D. Ariz. Jan. 31, 2018) (quoting *United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 420 (Ariz. Ct. App. 1983)). It is not necessary for a contract to specifically state that another writing is incorporated by reference; however, "the context in which the reference is made must make clear that the writing is part of the contract." *Prudential Ins. Co. of Am.*, 681 P.2d at 420.

Here, both the CMA Application and Margin Application booklets included

1  "Account Application Booklet and Agreements" in their titles. (Mot. Exs. 1, 2.) When
2  Plaintiff signed the CMA Application, he agreed that the Client relationship agreement was
3  "incorporated here by reference," and he also affirmed that "BY SIGNING BELOW, I
4  AGREE TO THE TERMS OF THE MERRILL EDGE SELF-DIRECTED INVESTING
5  CLIENT RELATIONSHIP AGREEMENT AND MERRIL EDGE SELF-DIRECTED
6  INVESTING TERMS OF SERVICE" and that per the "CLIENT RELATIONSHIP
7  AGREEMENT, I AM AGREEING IN ADVANCE TO ARBITRATE ALL
8  CONTROVERSIES THAT MAY ARISE BETWEEN ME AND MERRILL LYNCH[.]"
9  (Mot. Ex. 2 at 8 (capitalization in original).) Similarly, when Plaintiff executed the Margin
10 Application he agreed that he agreed "TO ARBITRATE ANY COTROVERSIES THAT
11 MAY ARISE WITH MERRILL LYNCH," and also that "I/WE HAVE RECEIVED A
12 COPY OF THE MARGIN AGREEMENT." (Mot. Ex. 6 at 3 (capitalization in original).)
13 Arizona courts have consistently found incorporation by reference on less. *See, e.g.*,
14 *Prudential Ins. Co. of Am.*, 681 P.2d at 420 (holding that a "'subject to' reference to the
15 plan was sufficient to incorporate it and that the plan did not have to be set out in full in
16 the contract."). Here, the language incorporating the arbitration provisions was
17 unequivocal, and Plaintiff even certified that he had received a copy of the Margin
18 Agreement. Thus, the Court finds that the agreements signed by Plaintiff incorporate the
19 arbitration provisions.

20 Plaintiff also argues that the agreements do not encompass the dispute at issue. He
21 argues that because his Complaint alleges a violation of federal securities laws and three
22 tort counts, which could have arisen in the absence of any contract, these claims are not
23 subject to arbitration. (Resp. at 6; *see generally* Compl.) In short, Plaintiff contends that
24 arbitration clauses must explicitly include tort actions in order for such actions to be subject
25 to arbitration. (Resp. at 6.)

26 This is a question of arbitrability, so federal substantive law governs absent a clear
27 delegation of this question to the arbitrator. *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719
28 (9th Cir. 1999); *Portland Gen. Elec. Co. v. Liberty Mut. Ins. Co.*, 862 F.3d 981, 985 (9th

Cir. 2017). Federal courts have consistently held that the language found in the agreements at issue creates a general arbitration clause, which includes related tort claims. *See, e.g. PRM Energy Sys., Inc. v. Primenergy, L.L.C.*, 592 F.3d 830, 836-37 (8th Cir. 2019). Thus, the Court finds that Plaintiff's claims are subject to arbitration.

When a court "determines that all of the claims raised in the action are subject to arbitration," the court "may either stay the action or dismiss it outright.*" Johnmohammadi v. Bloomingdale's Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014). Because the Court has found that all of Plaintiff's claims are subject to arbitration, it finds no reason to stay the proceedings. *See, e.g.*, *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1465 (9th Cir. 1983) (affirming district court's decision to stay lawsuit pending an arbitration that "might well decide issues which bear in some way on the court's ultimate disposition" of nonarbitrable claims). Accordingly, Defendant's Motion to Dismiss is granted, and Plaintiff must submit to arbitration.

## IV.    SUPPLEMENTAL BRIEFING RE EVIDENTIARY HEARING

In supplemental briefing filed after the Evidentiary Hearing, Plaintiff asks the Court to compel production of a notary journal before resolving Defendant's Motion. (Doc. 37 at 9.) Plaintiff attempts to cast doubt on whether the notarization process was conducted properly. Plaintiff argues that there remain unresolved factual questions arising from the public notary's failure to disclose certain intimate relations with Defendant's employee and the public notary's unavailability as a witness subject to cross-examination at the evidentiary hearing. (Doc. 37 at 8.)

However, the allegedly deficient notarization does not relate to any signature that bears on the Motion currently before the Court. The notarized document is the Trust Certification Form, but this document's purpose was to allow Plaintiff to certify the existence of a trust to Defendant. Even after casting a cloud over the legitimacy of the notarization process, Plaintiff still has not contested the validity of the signature itself. Thus, even if this signature were relevant, it is unclear what effect a deficient notarization process would have on the validity of the signature when Plaintiff does not actually contend

- 11 -

that the signature is invalid. Because the notarization of the Trust Certification Form is not relevant to Defendant's Motion, the Court will not compel production of the notary journal.

**IT IS THEREFORE ORDERED** granting Defendant's Motion to Dismiss (Doc. 13). Plaintiff is ordered to submit to arbitration consistent with the terms of the arbitration agreement, the Federal Arbitration Act, and this Order.

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment accordingly and close this case.

Dated this 31st day of March, 2022.

Honorable John J. Tuchi
United States District Judge